UNITED STATES OF AMERICA,

     Plaintiff

v.

THIRD COAST TOWING, LLC,
GREAT AMERICAN INSURANCE
AND NATURE'S WAY MARINE, LLC

     Defendants

AND

GREAT AMERICAN INSURANCE
COMPANY

     Cross-Claimant

v.

THIRD COAST TOWING, LLC

     Cross-Defendant

AND

GREAT AMERICAN INSURANCE
COMPANY

     Third Party Plaintiff

v.

AMERICAN STEAMSHIP OWNERS
MUTUAL PROTECTION & INDEMNITY
ASSOCIATION, INC. (THE AMERICAN
CLUB)

     Third Party Defendant

Civil Action No. 3:16-cv-34-CWR-FKB

**UNITED STATES' OPPOSITION MEMORANDUM TO PLAINTIFF NATURE'S WAY'S SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT OF THE UNITED STATES' CROSS MOTION FOR SUMMARY JUDGMENT**

The United States has filed suit against Nature's Way Marine, LLC and its insurer, Environmental Pollution Group, LLC (collectively "Nature's Way"), for recovery of $792,868.98 of oil spill removal costs under the Oil Pollution Act of 1990 ("OPA"), in addition to a claim for civil penalties for the discharge. Nature's Way filed a counter-claim against the United States seeking "equitable and declaratory relief" because the U.S. Coast Guard's National Pollution Funds Center ("NPFC") denied its administrative claim for reimbursement of oil spill removal costs. (Docs. 7, 8). Nature's Way now seeks judicial review of the NPFC's denial of its administrative claim to recover its oil spill removal costs, specifically its request that its liability under OPA be capped at the statutory limitation amount of its vessel the ENDEAVOR, which is $854,400. Nature's Way challenges the NPFC's denial, arguing that it was arbitrary and capricious, and not in accordance with law, pursuant to the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 702-06. The United States requests the Court grant summary judgment in its favor, finding that the NPFC's denial of Nature's Way's administrative claim was proper.

## I. STATEMENT OF ISSUES TO BE DECIDED BY THE COURT

1. Whether the NPFC acted in an arbitrary and capricious manner, or otherwise not in accordance with law, when it determined that Nature's Way was an operator of the barge MOC-12, and therefore not entitled to limit its liability to the statutory limitation amount of the M/V ENDEAVOR.

2. Whether the NPFC acted in an arbitrary and capricious manner, or otherwise not in accordance with law, when it denied Nature's Way's administrative claim based on Nature's Way's release of its rights against Third Coast Towing in a settlement agreement.

3. Whether the NPFC's denial of Nature's Way's administrative claim was untimely and should remain a part of the administrative record.

## II. BACKGROUND

A. Factual Background[1]

On January 26, 2013, the M/V ENDEAVOR ("ENDEAVOR"), a tugboat owned by Nature's Way, was pushing two tank barges, the MOC-12 and MOC-15,[2] southbound on the Lower Mississippi River near the Vicksburg Railroad Bridge ("the bridge") located at mile marker 434.5. Third Coast Towing, LLC ("Third Coast"), the owner of the barges MOC-12 and MOC-15, had entered into a contract with Nature's Way, whereby the ENDEAVOR would tow the barges laden with crude oil from Caloosa, Oklahoma to a discharge port in Louisiana.[3]

At approximately 11:30 p.m., Yancy Guidry, the pilot of the ENDEAVOR employed by Nature's Way, began his watch and took control of the tug and her tow.[4] Shortly after assuming watch, Mr. Guidry began navigating the ENDEAVOR and her tow towards the Vicksburg Railroad Bridge. As he approached the bridge, Mr. Guidry noticed that he had not properly aligned the vessel and her tow to pass under the preferred

---

[1] The United States filed the Certified Administrative Record with this Court on September 1, 2016. *See* Doc. 38.
[2] The tank barges MOC-12 and MOC-15 are dumb-barges, meaning they have no means of mechanical propulsion. *See* Exhibit "A," Certificate of Documentation for the MOC-12.
[3] Nature's Way and Third Coast Towage Contract; Admin. R. at 00363-365.
[4] USCG 2692 Report of Accident; Admin. R. at 00012-14.

span of the bridge, which was piers 3 and 4.  Instead, Mr. Guidry tried to maneuver the barges between piers 4 and 5 of the bridge, which caused the ENDEAVOR's tow to allide with the north face of pier 4.  The lead barge of the tow, MOC-15, broke away after the impact, sustaining damage but still afloat.  The second barge of the tow, the MOC-12, remained attached to the ENDEAVOR and itself allided head on with pier 4, damaging the barge and causing it to discharge over 7,100 gallons of crude oil into the Mississippi River.[5]

Nature's Way and EPG assumed responsibility for cleaning up the oil spill at the direction of the Coast Guard's Federal On-Scene Coordinator.[6]  On May 12, 2014, the NPFC issued a Notice of Potential Liability to Nature's Way as a responsible party ("RP") under OPA for oil spill removal costs incurred by the U.S. Coast Guard ("Coast Guard"), U.S. Environmental Protection Agency ("EPA"), and the State of Mississippi in the amount of $792,868.98.[7]  On September 30, 2014, the NPFC issued a Notice of Potential Liability for $792,868.98 to Third Coast as an RP.[8]  On April 23, 2015, the NPFC issued a second notice to Third Coast, Nature's Way, Great American and EPG, notifying all parties of their liability for the $792,868.98 oil spill removal costs.[9]  To date, these costs have not been paid to the NPFC.

B.  Procedural Background

1.  Nature's Way's Administrative Claim to the NPFC

---

[5] At the time of the incident, the MOC-12 was an inspected double-hull vessel, measuring 252 feet in length, and weighing 1,631 gross tons.  *See* Vessel General Permit for MOC-12; Admin. R. at 00368-370.

[6] *See* USCG's Notice of Designation to Nature's Way and Third Coast dated January 31, 2013, Admin R. at 00713-728.

[7] *See* NPFC Letter; Admin. R. at 00511-515.

[8] *See* NPFC Letter; Admin. R. at 00452-453.

[9] *See* NPFC Letters; Admin. R. at 00516-536.

On May 22, 2015, Nature's Way and EPG submitted an administrative claim to the NPFC requesting $2,138,382.15 for OPA compensable removal costs. Nature's Way and EPG calculated their claim amount by subtracting the OPA limitation value of its vessel the ENDEAVOR, $854,400.00, from their alleged total removal and clean-up costs totaling $2,992,782.15.[10] From their claim of $2,138,382.15, claimants also sought abatement of the removal costs billed to them by the Coast Guard in the amount of $792,868.98, which would reduce their total claim to $1,234,913.17. In response, the NPFC sent a letter to Nature's Way and EPG on June 24, 2015, advising that the proper limit of liability for their claim was $4,272,000, based on the size of discharging vessel, the barge MOC-12.[11] On July 31, 2015, Nature's Way and EPG provided the NPFC with supplemental information in support of their claim,[12] wherein they again argued that under 33 U.S.C. § 2704, the applicable limit of liability should be based on the value of the ENDEAVOR and that they should also be excused from reimbursing the Coast Guard for its removal costs totaling $792,868.98.

On March 16, 2016, the NPFC denied Nature's Way administrative claim because Nature's Way: (1) had not exceeded the applicable limitation amount of $4,272,000, and (2) failed to retain subrogation rights when it entered into a settlement agreement with Third Coast following litigation between the two companies.[13]

---

[10] *See* Nature's Way's administrative claim to NPFC dated May 22, 2015; Admin. R. at 00001-328.
[11] *See* Admin. R. at 00330.
[12] *See* Nature's Way supplemental letter in support of its administrative claim dated July 31, 2015; Admin. R. at 00343-382.
[13] *See* NPFC denial letter to Nature's Way dated March 16, 2016; Admin. R. at 00435-451.

2.  Litigation History

On January 22, 2016, the United States filed its complaint against Nature's Way Marine and Third Coast Towing to recover $792,868.98 of oil spill removal costs and for civil penalties.  (Doc. 1).  On March 17, 2016, Nature's Way answered and filed a counter-claim against the United States seeking "equitable and declaratory relief" because the NPFC had denied Nature's Way's administrative claim of $2,138,382.14. (Doc. 7).  Nature's Way and Third Coast also filed cross-claims against each other.[14] (Docs. 7, 27).  In its cross-claim against Third Coast, Nature's Way requests that if it is found liable along with Third Coast to the United States under OPA, then the Court find Third Coast and its insurers are precluded from asserting any claim for recovery against it because of its settlement agreement with Third Coast reached in the related litigation (described below).  (Doc. 7, ¶ 8).

a.  Related Litigation Between Third Coast and Nature's Way

On September 25, 2013, Third Coast filed suit against Nature's Way for breach of the contract of towage and commission of a maritime tort seeking $2,658,097 in damages for hull injury, salvage and recovery of the crude oil cargo on the barges, loss of crude oil cargo from the MOC-12, lost profits, and other costs.[15]  The parties entered into a settlement agreement in which Nature's Way paid $50,000 to Third Coast and $1,950,000 to its insurer, Atlantic Specialty Insurance Company.  Both parties released each other of "all claims for losses and damages of whatever nature and kind that the Parties raised, or could have raised, against each other from the damage allegedly

---

[14]  Nature's Way requests equitable and declaratory relief against Third Coast based on the Receipt, Release, Indemnification and Assignment Agreement it entered into with Third Coast.
[15]  *Third Coast Towing, LLC v. Nature's Way Marine, LLC,* C.A. No. 1:14-cv-47, (S.D. AL Dec. 31, 2014).

sustained and the spill, cleanup, salvage and related efforts . . ." The case was dismissed with prejudice.[16]

    b.   United States' Motion to Dismiss Nature's Way's Counter-Claim

In this case, the United States moved to dismiss Nature's Way's counter-claim against it arguing that Nature's Way was not entitled to discovery or a trial *de novo*. (Docs. 17, 18). On August 5, 2016, this Court partially granted the United States' motion to dismiss, finding that ". . . although these defendants [Nature's Way] remain entitled to *de novo* review of the agency's legal conclusions, that is not the same thing as trial *de novo*." (Doc. 37 at 2). This Court reserved any remaining issues of relief for summary judgment. *Id.*

    c.   Nature's Way's Motion in Limine

Nature's Way has filed a Motion in Limine with the Court requesting that portions of the NPFC's Certified Administrative Record (Doc. 38) be stricken because it contained reports, findings and other documentation from the Coast Guard that it argues are inadmissible in administrative proceedings under 46 U.S.C. § 6308. (Docs. 49, 50). The United States opposed Nature's Way's motion. (Doc. 51). The motion is pending before this Court.

## III. OPA'S STATUTORY HISTORY AND FRAMEWORK

A. The Oil Pollution Act of 1990

OPA is a comprehensive oil spill response and liability statutory scheme designed by Congress to ensure "those who produce, handle, and transport oil" are held strictly liable for removal costs and damages resulting from the discharges of oil. *See* H.R. Rep. No. 101-242, Part 2 at 36 (1989). OPA establishes (1) a strict liability scheme for oil

---

[16] *See* Settlement Agreement between Nature's Way and Third Coast; Admin. R. at 00377-382.

spill removal costs and related damages, and (2) an administrative adjudication process by which the United States pays eligible claims for those costs under prescribed conditions. 33 U.S.C. §§ 2701, *et seq.*

OPA's overarching theme is that the "polluter pays:" "[E]ach responsible party for a vessel or facility from which oil is discharged . . . is liable for the removal costs or damages . . . that result from such incident." 33 U.S.C. § 2702(a). A hallmark of OPA's scheme is that the liability of those that discharge oil is strict, joint, and several for removal costs and related damages. 33 U.S.C. §§ 2702 and 2703. *See In Re: Oil Spill by the Oil Rig Deepwater Horizon*, 844 F. Supp. 2d 746, 754 (E.D. La. 2012). OPA increased the liability limit for vessels from limits previously established under the Federal Water Pollution Control Act ("FWPCA"), 33 U.S.C. § 2704; expanded the scope of damages recoverable from RPs, 33 U.S.C. § 2702(b); and disallowed the OPA liability limitation altogether when the RP's gross negligence, willful misconduct, or violation of a federal safety, construction, or operating regulation proximately caused the oil spill. 33 U.S.C. § 2704. The statute restricts complete defenses to liability to discharges caused solely by acts of God, acts of war, or the acts or omissions of a third-party, provided, however, that the third-party was not in contractual relationship with the RP. 33 U.S.C. § 2703.

B. U.S. Coast Guard's National Pollution Funds Center Adjudicates Claims to the Fund

The United States Coast Guard is charged with implementing the relevant provisions of OPA, which includes adjudicating claims to the Fund.[17] 33 U.S.C. §§

---

[17] The Fund was created by 26 U.S.C. § 9509. Its claim procedures are found at 33 C.F.R. Part 136, Subpart C.

2712, 2713, 2714, 2716.[18]  The Coast Guard has delegated these tasks to the National

Pollution Funds Center.  The Fund is available to pay claims for uncompensated removal

costs determined by the NPFC to be consistent with the National Contingency Plan.[19]

C.  Claims to the Fund by a Responsible Party

Under limited circumstances, an RP may be reimbursed for some or all of its

incurred removal costs from the Fund.  33 U.S.C. § 2708.  To do so, the RP must first

establish it is entitled to one of the three statutorily enumerated complete defenses, or to a

limitation of liability.  33 U.S.C. §§ 2703, 2704, 2708(a) and (b), 2712(a)(4), 2713, and

33 C.F.R. § 136.205.  An RP is entitled to a complete defense only "if the responsible

party establishes by a preponderance of the evidence, that the discharge or substantial

threat of discharge of oil and resulting damages or removal costs were caused *solely* by 1)

an act of God; 2) an act of war; 3) an act or omission of a third party; or 4) a combination

of the three."  33 U.S.C. § 2703(a).  Absent a complete defense, the responsible party

pays.  33 U.S.C. § 2702(a); *see also Apex Oil Company, Inc. v. United States*, 208 F.

Supp. 2d 642, 651-652 (E.D. La. 2002).  The last of these three defenses, the so-called

third-party defense, has several limitations.  Specifically, a third party whose act or

omission solely caused the discharge must be a third party "other than an employee or

---

[18] OPA establishes categories of eligible claimants and claims, as well as general procedures for bringing those claims to the NPFC for adjudication.  33 U.S.C. §§ 2712-2713.  These procedures do not require the NPFC to conduct formal hearings under the APA, 5 U.S.C. § 554, and thus the NPFC's decision making is informal. 33 U.S.C. § 2713(a)-(e); *Bean Dredging, LLC, v. United States,* 773 F. Supp. 2d 63, 75 (D.D.C. 2011) (OPA does not require a formal hearing; NPFC's review of a claim for reimbursement is an informal adjudication); *see generally Woods v. Federal Home Loan Bank Board*, 826 F.2d 1400, 1408 (5th Cir. 1987).

[19] OPA provides: "The Fund shall be available to the President for – . . . (4) payment of claims in accordance with section 2713 of this title for uncompensated removal costs determined by the President to be consistent with the National Contingency Plan or uncompensated damages;" 33 U.S.C. § 2712(a)(4). The NCP is the federal government's blueprint for responding to oil spills and releases of hazardous substances. 33 U.S.C. § 1321(d); 40 C.F.R. § 300.5.  *See generally* 40 C.F.R. § 300 *et seq.*

agent of the responsible party or a third party whose act or omission occurs in connection with any contractual relationship with the responsible party . . . ." 33 U.S.C. § 2703(a)(3) (emphasis added).

Alternatively, to limit its liability under Section 2704, an RP must demonstrate that the incident was not "proximately caused by (a) gross negligence or willful misconduct or, (b) violation of an applicable Federal safety, construction, or operating regulation by, the responsible party, an agent or employee of the responsible party, or a person acting pursuant to a contractual relationship . . . ." 33 U.S.C. § 2704. The RP must also show that it provided "all reasonable cooperation and assistance requested by a responsible official in connection with removal activities . . . ." *Id.* OPA establishes limitation amounts based on gross tonnage of the discharging vessel. 33 U.S.C. § 2704(a)(1) and (d)(4). It is undisputed by the United States that the RPs here, Nature's Way and Third Coast, are entitled to limitation under this provision. The dispute at issue here is about the measure of that limitation.

If the NPFC determines that an RP is entitled to limitation, then the NPFC will evaluate whether the costs submitted by the RP are compensable removal costs and thus reimbursable from the Fund. Payment by the NPFC is also contingent upon the claimant subrogating to the United States all rights it has against other parties. *See* 33 U.S.C. § 2715. Specifically, OPA provides that "[p]ayment of any claim or obligation by the Fund under this Act shall be subject to the United States Government acquiring by subrogation all rights of the claimant . . . to recover from the responsible party." 33 U.S.C. § 2712(f); *Rick Franklin Corp. v. Dep't of Homeland Security,* 2008 WL 337978 at *6 (D.C. Or. February 4, 2008). Thus, whether limitation is available to an RP and further, whether an

RP is entitled to reimbursement of the asserted removal costs, requires two separate administrative determinations by the NPFC.

## III.  STANDARD OF REVIEW

Summary Judgment Standard in an APA Case

Summary judgment is appropriate, if when viewed in the light most favorable to the non-moving party, there is no genuine issue to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  Summary judgment standards are applicable in APA cases where, as here, cross-motions are filed.  *See Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 884-85 (1990); *Applications Research Corp. v. Naval Air Dev. Ctr.*, 752 F. Supp. 660, 664-66 (E.D. Pa. 1990).  However, the manner of applying Fed. R. Civ. P. 56 in APA cases differs from non-APA cases:

> The district court sits as an appellate tribunal in such a case, and the question of whether [the agency] acted in an arbitrary and capricious manner is a legal one which the district court can resolve on the agency record—regardless of whether it is presented in the context of a motion for judgment on the pleadings or in a motion for summary judgment (or in any other Rule 12 motion under the Federal Rules of Civil Procedure).

*University Med. Ctr. Of S. Nev. v. Shalala*, 173 F.3d 438, 440 n.3 (D.C. Cir. 1999) (citations omitted).

The APA's arbitrary and capricious standard controls judicial review of NPFC decisions to deny a responsible party's claim seeking either a complete defense or statutory limitation of liability under OPA.  *See Buffalo Marine Servs. Inc.*, 663 F.3d 750, 753 (5th Cir. 2011) ("The Administrative Procedure Act allows a federal court to overturn an agency's ruling only if it is arbitrary, capricious, an abuse of discretion, not in

accordance with law, or unsupported by substantial evidence on the record taken as a whole.")  "This standard of review is highly deferential, and [the Court] should not substitute [its] own judgment for the agency's."  *Gulf Restoration Network v. United States DOT*, 452 F.3d 362, 368 (5th Cir. 2006) (citation omitted).  "We must 'accord the agency's decision a presumption of regularity.'"  *Pension Benefit Guar. Corp. v. Wilson N. Jones Mem. Hosp.*, 374 F.3d 362, 366 (5th Cir. Tex. 2004) (internal citations omitted).  "Reversal is appropriate only where the administrative action is irrational or not based on relevant factors."  *NVE, Inc. v. Department of Health & Human Servs.*, 436 F.3d 182, 190 (3d Cir. 2006).

Additionally, to the extent the NPFC found that Nature's Way was an "operator," as that term is defined by OPA, or waived its subrogation rights against Third Coast, those determinations are acts of statutory interpretation under OPA, and are entitled to deference under *Chevron U.S.A. Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984) (holding an agency's interpretation of a statute it administers is owed deference by courts when "the statute is silent or ambiguous" on the issue in question and the agency's reading represents a "permissible construction of the statute").

Here, Nature's Way seeks judicial review of the NPFC's denial of its administrative claim to limit its liability for oil spill removal costs.  The United States respectfully submits that the NPFC's denial should be upheld.  However, if this court determines that the NPFC's decision to deny Nature's Way's claim was arbitrary, capricious, or an abuse of discretion, then the proper course of action would be to remand the matter back to the NPFC for further determinations consistent with the Court's opinion.  *See Moretti v. Hoffman*, 526 F.2d 1311, 1312 (5th Cir. 1976) ("If the agency

action is found to be improper, the matter should be remanded to the agency; it would be improper to conduct *de novo* proceedings in the form of a trial by the district court to consider extra record information.").

## IV. ANALYSIS

A. The NPFC's finding that Nature's Way's liability must be based on the value of the discharging vessel, the MOC-12 barge, was not arbitrary or capricious.

Nature's Way argues that the NPFC's denial of its claim was error because OPA Section 2708 affords it recovery for those sums it has spent in excess of $854,400, the OPA limitation value of its vessel, the tug ENDEAVOR. As will be shown, Nature's Way is an OPA statutory responsible party and the limit of its liability must be based on the limitation value of the discharging vessel, the barge MOC-12 ($4,272,000), that it was pushing at the time of the oil spill. Accordingly, because Nature's Way's removal costs ($2,138,382.15) have not exceeded the applicable OPA limitation of liability amount ($4,272,000), the NPFC's denial of its administrative claim should be upheld.

OPA makes "each responsible party for a vessel or a facility from which oil is discharged . . . liable for removal costs and damages." 33 U.S.C. § 2702(a). OPA also provides that "the total liability of a responsible party under section 2702 of this title shall not exceed" a limit based on the size of the vessel from which the oil is discharged. *See* 33 U.S.C. § 2704(a).

Any limitation allowed an RP is based on the formula set out in section 2704. The limit of liability created by section 2704 must be read together with the section of OPA imposing liability, 33 U.S.C. § 2702. Section 2704 states that a responsible party may limit, 'the total of the liability of a responsible party under section 2702 of this title." 33 U.S.C. § 2702(a)(1) only imposes liability on, "each responsible party for a vessel or

facility from which oil is discharged," meaning that the scope of the liability imposed on the responsible party is only the liability that comes from the discharging vessel. Because section 2702(a) imposes liability on responsible parties for discharging vessels, the liability limits provided for in section 2704 should likewise be based upon the size and type of the discharging vessel. Despite the general rule, 33 U.S.C. § 2702(d)(2) provides a limited exception by allowing a sole fault third party to claim a limit of liability based upon the size and type of a non-discharging vessel when the third party's fault occurs in connection with a vessel. This limited exception for non-discharging vessels supports the conclusion that OPA's liability limits should normally be based upon the size and type of the discharging vessel. If it were otherwise, there would be no reason for Congress to create the exception in 33 U.S.C. § 2702(d)(2).

In this case, the vessel from which the discharge emanated was the MOC-12, a double-hull vessel weighing 1,631 gross tons.[20] For a double hull vessel of that weight, the OPA limitation is $2,000 per gross ton or $4,272,000.00 whichever is greater. 33 U.S.C. § 2704(a)(1)(B) and (C)(ii)(II); 33 C.F.R. §138.230 (2009). Here, the greater limitation amount is $4,272,000.[21] Thus, Nature's Way's administrative claim to the NPFC for removal costs of $2,138,282.15 does not exceed the applicable limitation amount because Nature's Way was an "operator" of the barge within the meaning of OPA.

---

[20] *See* Vessel General Permit for the MOC-12; Admin. R. at 00368-370.
[21] The United States submits that the appropriate OPA limitation amount in this matter is based only on the value of the MOC-12 barge and not the combined value of Nature's Way's ENDEAVOR and the MOC-12.

1. Nature's Way was a Responsible Party operating the barge MOC-12 at the time of the allision.

In its motion for summary judgment, Nature's Way does not dispute that it was both owner and operator of the vessel M/V ENDEAVOR.  Rather, Nature's Way argues it did not operate the MOC-12 barge because its vessel, the ENDEAVOR, "only moved the barge from point A to point B under the complete direction of Third Coast Towing" and Third Coast "dictated which ports and routes Nature's Way Marine would take to deliver the barges MOC 12 and MOC 15."  (Doc. 56 at 10-11).

OPA's liability provision states:

Notwithstanding any other provision or rule of law, and subject to the provisions of this Act, *each responsible party for a vessel or a facility from which oil is discharged*, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone *is liable for the removal costs* and damages specified that result in subsection (b) that result from such incident.

33 U.S.C. 2702(a) (emphasis added).[22]   OPA defines a responsible party with respect to vessels to mean "any person owning, operating, or demise chartering the vessel."  33 U.S.C. § 2701(32).  (Somewhat less helpfully, the statute also defines "owner or operator" to mean "any person owning, operating, or chartering by demise, the vessel."  33 U.S.C. § 2701(26)).  Thus, given the clear language of the liability provision quoted above, OPA applies to any owner or operator "for a vessel . . . from which oil is discharged."[23]  Here, barring Nature's Way being found a sole fault third party, which it

---

[22]  This language is repeated in section 2708, which allows a responsible party itself to bring a claim to the Fund, as Nature's Way has done here: "The responsible party for a vessel or facility from which oil is discharged . . . may assert a claim for removal costs . . . ."
[23] As noted above, a vessel or facility can have multiple owners or operators and, therefore, multiple responsible parties. *See, e.g., In Re: Deepwater Horizon*, 844 F. Supp. 2d at 754; *see also Geraghty and Miller, Inc. v. Conoco, Inc.*, 234 F.3d 917, 928 (5th Cir. 2000) (noting under CERCLA that a facility may have more than one operator).

concedes it is not, Nature's Way is a responsible party under OPA only if it was an "operator" of the barge at the time of the oil spill. Logic dictates that it was.

It is undisputed that at the time of the oil spill, Nature's Way was towing the MOC-12 and MOC-15 pursuant to its contract of towage with Third Coast Towing. The MOC-12 and MOC-15 are "dumb-barges," meaning they have no means of propulsion and cannot move without assistance from a vessel like the ENDEAVOR.[24] The ENDEAVOR's pilot, Mr. Guidry, was personally controlling the barges. In denying Nature's Way's administrative claim, the NPFC found that the ENDEAVOR and the barges effectively acted as a "single unit" and therefore, Nature's Way was operating the MOC-12 within the meaning of OPA sections 2701 and 2702.[25]

The court need look no further than the statute to determine that Nature's Way is a responsible party. Under any reasonable construction of the term "operator," an entity navigating and controlling dumb-barges through the use of a tugboat is obviously operating those barges. Thus, the NPFC reasonably determined that Nature's Way is an operator within the meaning of OPA.

The NPFC's determination is also consistent with *Commonwealth of Puerto Rico v. M/V Emily S*, 13 F. Supp. 2d 147 (D. Puerto Rico, 1998). In that case, the tug *Emily S* was towing the *Morris J. Berman*, a dumb-barge loaded with bunker #6 oil, when the towing wire between the tug and barge parted causing the barge to become grounded and spill oil off the coast of Puerto Rico. Like the MOC-12, the *Berman* was an unmanned barge and had no means of self-propulsion. The owner of the *Emily S* argued that the tug was not a discharging vessel, and as such, it was not a responsible party under OPA. The

---

[24] *See* Exhibit "A."
[25] *See* NPFC's denial letter dated March 16, 2016; Admin. R. at 00435-451.

court found that the barge was under the complete control of the tug *Emily S* and all navigational decisions concerning the barge were made by the crew of the *Emily S*. *Id.* at 148. The court further held that the *Berman* barge was a "discharging vessel" under the terms of OPA, making the *Emily S's* owner a "responsible party" for the oil spill. *Id.* at 148-149, citing *In the Matter of Olympic Tug*, 1990 AMC 1671 (W.D. 2022 Wash. 1990), ("a tug is thus a necessary adjunct to a barge, and it seems natural to consider the two as a single entity.") The court in *Emily S* partially relied on *Sturgis v. Boyer*, a Supreme Court case, which held:

> "…whenever the tug, under the charge of her master and crew, and in the usual and ordinary course of such employment, undertakes to transport another vessel, which, for the time being, has neither her master no crew on board, from one point to another, over waters where such accessory motive power is necessary or usually employed, she must be held responsible for the proper navigation of both vessels, and third persons suffering damages through the fault of those in charge of the vessel must, under such circumstances look to the tug, her master or owners, for the recompense which they are entitled to claim for any injuries…"

*Id.*, citing *Sturgis v. Boyer*, 65 U.S. 110 (1861).[26]

Nature's Way attempts to differentiate the *Emily S* case from the instant matter arguing that the presence of a demise charter of the *Emily S* by another company, that also owned the barge being towed, makes it distinguishable.[27] (Doc. 56 at 10). While

---

[26] This rule has been consistently followed in admiralty law. "It has been long established that the flotilla as a whole, comprising tug and tow is considered a unit." *Rivera v. M/T FOSSARINA, S/T*, 663 F. Supp. 544 (D. Puerto Rico, 1987) citing *The Gladys*, 144 F. 653 (2d Cir. 1906). "Legally speaking, barges are considered under the control of the tug's licensed crew." *Id.*, citing *Jackson v. Moran Maritime Assocs.*, 1980 AMC 2134, 2136 (S.D. Fla. 1980).
[27] "[U]nder a bareboat or demise charter . . . the full possession and control of the vessel is transferred to the charterer . . . the vessel is transferred without crew, provisions, fuel or supplies, *i.e.*, 'bareboat' [] and when, and if, the charterer operates the vessel he must supply also such essential operating expenses. Because the charterer's personnel operate and man the vessel during a demise charter, the charterer has liability for any and all casualties resulting from such operation and therefore provides insurance for such liability []." *In re Nature's Way Marine,*

true, this does not change the import of the analysis.  In *Emily S* the issue was whether the owner of the tug, MCC, not its demise/bareboat charterer, could be a responsible party under OPA.  In other words, the court found a party with even less of a connection to the towed barge than in the present instance to be a responsible party solely because its tug was towing the dumb-barge.  *Emily S*, 13 F. Supp. 2d at 149.  The point for which the case was cited by the government was simply that a previous court interpreting OPA has viewed the entity that owned the tug to be a responsible party because of the tug's control of the discharging barge.  Here, Nature's Way had one-hundred percent control of the tug and MOC-12 at the time of the allision.  It makes little sense to suggest, as Nature's Way would have it, that Third Coast, the barge owner, was "operating" the barges when they were being maneuvered through the bridge spans.  Moreover, there is nothing in OPA to prevent a vessel from having more than one operator, just as it may have more than one owner.  Cf. 21 F. Supp. 3d 657, 755-56 (Transocean was "operator" of the *Deepwater Horizon* even though BP was "operator" too).

2. Consistent with *United States v. Bestfoods*, Nature's Way is an "operator" of the MOC-12.

Nature's Way cites *United States v. Bestfoods* to argue it cannot be an operator of the MOC-12.  *United States v. Bestfoods*, 524 U.S. 51 (1998).  In *Bestfoods* the issue before the Court was under what circumstances a parent corporation could be deemed an operator under CERCLA for the purposes of imposing liability with respect to the releases of hazardous wastes from a chemical manufacturing facility, ostensibly under the control of the parent's subsidiary.  *Id*. at 60.

---

*LLC*, 984 F. Supp. 2d 1231, 1241 (S.D. Ala. 2013), citing *Walker v. Braus*, 995 F.2d 77 (5th Cir. 1993).

In *Bestfoods*, the facility in question, owned by a subsidiary of CPC International Inc., was littered with thousands of drums leaking chemical waste. The EPA incurred costs cleaning up the facility and sought to recover those costs from a number of RPs including CPC. The government argued, among other facts, that because some members of the board of directors for the parent corporation were also on the board of directors for the subsidiary, CPC was liable as an operator. *Id.* at 56-58. The Court found that a parent corporation may be directly liable under CERCLA, for its own actions in operating a facility owned by its subsidiary.[28]

Notably, the *Bestfoods* court first highlighted the ordinary meaning given to the term operate: "[t]o control the functioning of; run: *operate a sewing machine.*" *Id.* at 66, citing American Heritage Dictionary 1268 (3d ed. 1992); *see also* Webster's New International Dictionary 1707 (2d ed. 1958) ("to work; as, to *operate* a machine). To "sharpen" the definition for purposes of CERCLA's concern with environmental contamination, the Court in *Bestfoods* gave the word "operate" the following meaning:

> [A]n operator must manage, direct, or conduct operations specifically related to pollution that is having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations. . . . In our enquiry into the meaning Congress presumably had in mind when it used the verb "to operate" we recognized that the statute obviously meant something more than mere mechanical activation of pumps and valves and must be read to contemplate "operation" as including the exercise of direction over the facility's activities.

*Id.* at 66-67, 71.

The issues raised by the relationship between the parties in *Bestfoods* are not present here. In *Bestfoods*, the critical issue was the extent of the parent corporation's involvement in an "organizational sense," *i.e.*, decisions regarding the manufacture,

---

[28] Under CERCLA, any person who operates a polluting facility is directly liable for the costs of cleanup. 42 U.S.C. § 9607(a)(2).

storage, and disposal of chemical wastes for a subsidiary owned facility for the purposes of determining parent liability as operator.[29] Here, Nature's Way's involvement in operating Third Coast's barges is immediate and direct, in that the ENDEAVOR controlled the function and movement of the MOC-12 and MOC-15.

Nature's Way clearly meets the definition of operator because it was *conducting the operation of* the MOC-12 barge at the time of the oil spill.[30] As noted in *Bestfoods*, "[u]nder the plain language of [CERCLA], any person who operates a polluting facility is directly liable for the costs of cleaning up the pollution." *Id.* at 64. As discussed above, Nature's Way had exclusive navigational control over the barge when it pushed the MOC-12 barge into the bridge. Operating a tug and barge tow requires skill and judgment by the mariner as he maneuvers tows through dangerous or congested waters, undertakes berthing operations in busy harbors, and utilizes navigation devices such as radar, GPS, fathometers, and other aids to navigation. Thus, to operate a tug and tow, a mariner must be licensed by the Coast Guard with a tow endorsement. *See* 46 C.F.R. Part 11.464. Operating a tug and barge tow requires much more than mere mechanical activation of the tugboat's instruments. Indeed, Nature's Way made all of these decisions in real-time and did not need permission from Third Coast to do so. Thus, under any construction of the term "operator," Nature's Way is a responsible party for the barges.

---

[29] The United States and Nature's Way appear to agree that the *Bestfoods* test applies in the OPA context. *See* Doc. 56 at 10.

[30] Note that another district court has interpreted "operator" of a facility under the Clean Water Act to include an entity that "has the power or capacity to (i) make timely discovery of discharges, (ii) direct the activities of persons who control the mechanisms causing the pollution, and (iii) prevent and abate damage. *Beartooth Alliance v. Crown Butte Mines*, 904 F. Supp. 1168 (D. Mont. 1995), citing *Apex Oil Co. v. United States*, 530 F.2d 1291, 1293 (8th Cir. 1976).

3. OPA's financial assurance requirements do not preclude Nature's Way from being an operator of the MOC-12.

To further support their limitation argument, Nature's Way cites the financial regulations promulgated by the Coast Guard at 33 C.F.R. 138 Subpart A – Financial Assurances for Water Pollution.  Under OPA's comprehensive oil spill response and liability scheme, vessel owners and operators must establish evidence of financial responsibility sufficient to meet the maximum amount of liability to which they could be subjected under the limitation of liability provisions.  *See* 33 U.S.C. 2716(a).  This financial responsibility requirement ensures that a party responsible for a vessel operating in U.S. navigable waters has at least some ability to pay for the costs of cleanup arising from an oil discharge from its vessel.  To help determine who must maintain such proof of financial responsibility the Coast Guard has issued regulations which include the following definition:

> Operator means a person who is an owner, a demise charterer, or other contractor, who conducts the operation of, or who is responsible for the operation of, a vessel. A builder, repairer, scrapper, lessor, or seller who is responsible, or who agrees by contract to become responsible, for a vessel is an operator. A time or voyage charterer that does not assume responsibility for the operation of a vessel is not an operator for the purposes of this subpart.

33 C.F.R. §138.20.  By analogy, Nature's Way argues its role was closer to a voyage charterer of the barge owned by Third Coast and not an operator.

Nature's Way's reliance on this regulatory definition of "operator" is misplaced.  First, the definition of operator found in 33 CFR §138.20(b) is limited by its terms to apply only to Part 138 of the regulations and does not purport to affix liability.  The purpose of Subpart A is to inform owners and operators of vessels when and to what extent they must maintain minimum financial surety for their vessels.

Second, even assuming that the definition of operator within the financial assurances regulations also applied to liability, Nature's Way again falls within the scope of that definition.  As discussed herein, Nature's Way was in a command and control of the navigation of the MOC-12 and MOC-15.  This role is analogous to an "*other contractor, who conducts the operation of, or who is responsible for the operation of, a vessel,*" as set out in the regulations.  33 C.F.R. § 138.20.  Even assuming the regulation could guide this Court on the issue before it, which it cannot, under the towage contract, Third Coast was deemed the "voyage charterer" of the tug ENDEAVOR (as it hired Nature's Way to move the MOC-12 and MOC-15) and not vice-versa as Nature's Way suggests.[31]

4. Nature's Way is not entitled to sole fault third party status under OPA Section 2702(d)(1)(A).

Nature's Way contends that it has never predicated its recovery under OPA on any alleged sole fault third party status and avers that the NPFC "invented" its reliance on OPA Section 2702(d)(1)(A). (Doc. 56 at 7-8).  However, in its July 31, 2015 supplemental letter in support of its administrative claim to the NPFC, Nature's Way repeatedly referred to itself as a "third-party contractor" in an attempt to limit its liability to the value of the ENDEAVOR.[32]  Although Nature's Way has apparently abandoned such argument, the NPFC addressed it because under the facts, it appeared to be the only way Nature's Way would ever be able to limit its liability to the OPA limitation amount for the ENDEAVOR.

---

[31] See Contract of Towage at Admin. R. at 00363-365.
[32] See Nature's Way's July 31, 2015 supplemental letter to NPFC; Admin. R. at 00345-346, 00353-354.

OPA permits a third party to be treated as an RP if the statutory RP can establish the oil spill was caused solely by an act or omission of one or more third-parties defined in 33 U.S.C. § 2703(a)(3). Specifically, 33 U.S.C. § 2702(d)(1)(A) provides:

> *Third party treated as responsible party*. Except as provided in subparagraph (B), in any case in which a responsible party establishes that a discharge or threat of discharge and the resulting removal costs and damages were caused *solely* by an act or omission of one or more third parties *described in section 2703(a)(3)* . . . the third party or parties shall be treated as the responsible party or parties for purposes of determining liability under this subchapter.

33 U.S.C. § 2702(d)(1)(A) (emphasis added). Accordingly, where a third-party is the sole cause of a discharge, it may be treated as an RP, subject to section 2703(a)(3). Under section 2703(a)(3), for the third-party defense to apply, an RP must establish that a spill is caused solely by "an act or omission of a third party, *other than an employee or agent of the responsible party or a third party whose act or omission occurs in connection with any contractual relationship with the responsible party* . . ." 33 U.S.C. §2703(a)(3) (emphasis added).

Here, Nature's Way cannot be a sole fault third-party under Section 2703(a)(3) because its involvement in this incident occurred in connection with its contractual relationship with Third Coast. *See Buffalo Marine Servs., Inc. v. United States*, 663 F.3d 750, 755-56 (5th Cir. 2011) ("Any contractual relationship, even indirect vitiates the third party defense under Section 2703"). The Fifth Circuit has held that the phrase "in connection with *any* contractual relationship with the responsible party," should be broadly interpreted to include even indirect chains of contractual relationships. *Id.*

Moreover, the third party defense is narrowly construed; an owner or operator asserting the defense must show that the discharge was totally beyond its control.

*Xiamen Ocean Shipping Co. v. United States*, 2012 WL 12882375, at *7 (D. Haw. Dec. 28, 2012); *see also Buffalo Marine Servs., Inc. v. United States*, 663 F.3d 750, 757 & n.36 (5th Cir. 2011) (narrowly interpreting "contractual relationship" limitation to OPA's third party defense). "Any conduct, however slight, on the part of an owner or operator contributing to a spill would negate relief" from the defense. *Reliance Ins. Co. v. United States*, 677 F.2d 844, 849 (Ct. Cl. 1982) (interpreting CWA § 311(i)). The oil spill in this matter occurred while Nature's Way's ENDEAVOR was towing the MOC-12 pursuant to its contract with Third Coast. Therefore, Nature's Way cannot be a sole fault third-party under Section 2703(a)(3) and the applicable limit of liability in this case must be determined by the value of the discharging vessel, the MOC-12.

    B.  Nature's Way is not entitled to reimbursement by the Fund because it compromised its subrogation rights against Third Coast.

The NPFC's denial of Nature's Way's administrative claim should also be upheld because Nature's Way waived its subrogation rights against Third Coast by entering into a settlement agreement.[33] Under OPA, several requirements must be satisfied before a claim may be paid. A critical one is in section 2712(f), which provides that "[p]ayment of any claim or obligation by the Fund under this Act shall be subject to the United States Government acquiring by subrogation all rights of the claimant . . . to recover from the responsible party." 33 U.S.C. § 2712(f). Payment by the NPFC of removal costs from the Fund is therefore contingent upon a claimant subrogating to the United States all rights it has against other parties.

As a threshold point, Nature's Way argues summary judgment is not appropriate here because the NPFC's denial of its administrative claim is premature. (Doc. 56 at 12).

---

[33] *See* Settlement Agreement at Admin. R. at 00377-382.

Specifically, Nature's Way argues there is pending litigation between it and Third Coast concerning the scope of their settlement agreement which must be resolved.[34]  However, as noted, Nature's Way is concurrently seeking payment of $2,138,382.15 from the Fund through its counter-claim filed against the United States.  (Doc. 8).  The NPFC reviewed the settlement agreement between Third Coast and Nature's Way, which is part of the agency's administrative record, and determined that denial of Nature's Way's administrative claim was appropriate under Section 2712(f).  Thus, Nature's Way characterization of this issue as "premature" is not correct.[35]

33 U.S.C. § 2715(c).

In *Rick Franklin Corp. v. U.S. Dept. of Homeland Security*, a district court upheld the denial of an administrative claim by the NPFC because a claimant had partially released its rights against an RP violating section 2712(f).  *Rick Franklin Corp. v. U.S. Dept. of Homeland Security*, Civ. No. 06-1647, 2008 WL 337978 (D. Or.).  The court offered the following interpretation of section 2712:

> The plain language of § 2712(f) uses the words "all rights" when describing what subrogation rights will be acquired by the government when a claimant is compensated by the Fund.  No time limitation or any other limitation is contained in that section.  The language of the statute gives no indication that Congress intended any limitation on the government's subrogation rights.  The statute clearly provides that a claimant must be able to supply the government with *all* of its subrogation rights against a responsible party.

---

[34] *See* Third Coast and Nature's Way cross-claims at Docs. 7 and 27.  Nature's Way contends that there is a dispute between it and Third Coast concerning the scope of their settlement agreement and what costs were covered under it.  (Doc. 56 at 12).

[35] It also should be noted that if the NPFC's denial of Nature's Way's claim requires resolution of Nature's Way's and Third Coast's cross-claims against each other, then Nature's Way's counter-claim against the United States is premature and must be dismissed in its entirety. Under section 2713(b)(2) "no claim against the Fund may be approved or certified during the pendency of an action by the person to recover costs which are the subject of the claim."  33 U.S.C. § 2713(b)(2).

*Id.* at *5.  The *Rick Franklin* court also found the Eleventh Circuit's decision in *Kenan Transport Co. v. U.S. Coast Guard*, 211 Fed. Appx. 902, 903 (11th Cir. 2006), to be instructive.  In *Kenan*, the Eleventh Circuit affirmed a district court's interpretation of section 2712 when it held that any reimbursement from the Fund is "conditioned upon the claimant transferring to the government the claimant's rights to recover from the responsible party." *Id.*

Here, the agreement between Nature's Way and Third Coast states:

> Nature's Way and Third Coast enter into this Settlement Agreement in order to fully and completely settle, satisfy, compromise and *discharge any and all claims for losses and damages of whatever nature and kind that the Parties here raised, or could have raised, against each other from the damage allegedly sustained and the spill, cleanup, salvage, and related efforts.*[36]

Nature's Way clearly did not retain its rights against Third Coast to subrogate them to the United States.  33 U.S.C. § 2702 provides different remedies for recovering removal costs.  Under section 2702(b)(1)(A), the United States can recover the removal costs incurred by the FOSC from either of the RPs, Nature's Way or Third Coast.  Here, those costs total $792,868.98.  Under section 2702(b)(1)(B), however, the United States may recover removal costs incurred by any person, so long as the actions were consistent with the NCP.  Here, if the NPFC had paid Nature's Way's claim for removal costs, it would not be able to recover those costs from Third Coast under section 2702(b)(1)(A) because those costs were not incurred by an FOSC acting under the FWCPA response authority.  Instead, the costs were incurred by Nature's Way and EPG.  Accordingly, the NPFC's denial of Nature's Way's claim pursuant to 33 U.S.C. §2712(f) was proper and should be upheld.

---

[36] *See* Settlement Agreement; Admin. R. at AR00428-434 (emphasis added).

C.     The NPFC's Determination was timely and should remain part of the administrative record.

Lastly, Nature's Way contends that the NPFC's March 16, 2016 denial of its administrative claim should be set aside because it was allegedly "untimely on its face" and impermissibly relied upon material expressly barred by 46 U.S.C. § 6308(a).  (Doc. 56 at 14-16).  Both arguments fail as a matter of law and the administrative record in this matter should not be altered in any way.[37]

As briefed in United States' response in opposition to Nature's Way's motion *in limine* (Doc. 51), under 33 C.F.R. § 136.115, a claimant may opt to deem its claim "finally denied" six months after its claim was filed if the NPFC has not issued a decision.  (Doc. 51 at 7).  Contrary to Nature's Way's argument, there is no imaginary automatic denial issued to a claimant at the expiration of the six month period.  Rather, it simply presents an opportunity for the claimant to invoke the *option* to deem the claim denied any time thereafter.  *See* 33 C.F.R. §136.115(c).  Here, Nature's Way did not invoke that option until it filed its answer and counter-claim against the United States on March 17, 2016, long after the option to deem the claim denied was available and after NPFC issued its Determination. (Doc. 8 at ¶13).

Similarly, Nature's Way's reliance on *Water Quality Ins. Syndicate v. United States*, --- F. Supp. 3d ---, 2016 WL 7410549 (D.D.C. Dec. 22, 2016) is misguided.  As previously explained in the United States' opposition to Nature's Way's motion *in limine*, the facts of that case are clearly distinguishable from this matter.  (Doc. 51 at 8-9).

---

[37] The United States respectfully refers the Court to its Response in Opposition to Nature's Way's Motion in Limine to Exclude Portions of the NPFC's Administrative Record (Doc. 51), which is incorporated herein in its entirety.

Likewise, Movants' assertion that the NPFC acted arbitrarily and capriciously by relying on 46 U.S.C. § 6308(a) material in the administrative record is also incorrect. (Doc. 56 at 15-16). "The plain language of 46 U.S.C. § 6308 does not indicate an intent to include the NPFC's claims process, because that process is an internal, informal agency process." *Use of Reports of Marine Casualty in Claims Process by National Pollution Funds Center*, 71 Fed. Reg. 60553-01, 2006 WL 2918167 (Oct. 13, 2006); *see also Bean Dredging, LLC v. United States*, 699 F. Supp. 2d 118, 128-29 (D.D.C. 2010); *Water Quality Ins. Syndicate v. United States*, --- F. Supp. 3d. ---, 2016 WL 7410549, *7-9, *18 (D.D.C. Dec. 22, 2016).

Here, Nature's Way has acknowledged that "virtually all of the findings in the NPFC's 2016 Decision [were]…legal conclusions." (Doc. 56 at 5, referencing Doc. 38, at AR 00441.). Accordingly, the issues before this Court on summary judgment are issues of law. The NPFC denied Nature's Way's administrative claim because it relied on the wrong vessel when calculating its limits of liability under OPA[38] and because Nature's Way cannot provide subrogated rights to the United States to recover against Third Coast because it waived them in a settlement agreement. Thus, Nature's Way's argument that the Coast Guard MISLE materials have undermined and prejudiced the NPFC's decision is immaterial.

## CONCLUSION

For the reasons set forth above, this Court should grant the United States' Motion for Summary Judgment and uphold the findings of the NPFC.

---

[38] *See* Admin. R. at 00438-50.

Dated:  April 10, 2017

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

STEPHEN G. FLYNN
Assistant Director Admiralty
U.S. Department of Justice
Aviation & Admiralty Litigation
Torts Branch, Civil Division

 /s/ Jessica G. Sullivan
JESSICA G. SULLIVAN
Trial Attorney
Aviation & Admiralty Litigation
Torts Branch, Civil Division
P.O. Box 14271
Washington, DC  20044-2471
Tel: (202) 616-4046
Fax: (202) 616-4002
Email:  Jessica.Sullivan@usdoj.gov

ELLEN M. MAHAN
Deputy Section Chief
Environmental Enforcement Section
Environment and Natural Resources
Division
United States Department of Justice

ELISE S. FELDMAN
Senior Counsel
United States Department of Justice
Environment and Natural Resources
Division
Environmental Enforcement Section
301 Howard Street, Suite 1050
San Francisco, CA  94105
Tel: (415) 744-6470
Fax: (415) 744-6476
Email: Elise.Feldman@usdoj.gov

*Attorneys for Plaintiff*
UNITED STATES OF AMERICA

Of Counsel:

LCDR Nicholas J. Tabori
National Pollution Funds Center
U.S. Coast Guard Stop 7605
2703 Martin Luther King Jr. Ave.
Washington, DC  20593-6064

LT Sean R. Gajewski
Office of Claims and Litigation
Coast Guard Headquarters
2703 Martin Luther King Jr. Ave. SE
Washington, DC  20593-7213

## CERTICATE OF SERVICE

      I HEREBY CERTIFY that on April 10, 2017, I served the foregoing on the following counsel of record by way of the CM/ECF system which will provide each counsel a copy by electronic mail.

/s/ Jessica G. Sullivan
JESSICA G. SULLIVAN

Neville H. Boschert, Esq.
Jefferson R. Tillery, Esq.
Jones Walker LLP
190 E. Capitol St, Ste. 800 (39201)
POB 427
Jackson, MS 39205
nboschert@joneswalker.com
jtillery@joneswalker.com

Kate Margolis, Esq.
Bradley Arant Boult Cummings
One Jackson Place
188 E. Capitol St., Ste. 400
Jackson, MS  39201
kmargolis@babc.com

Kevin J. LaVie, Esq.
Phelps Dunbar LLP
Canal Place
364 Canal Street, Ste. 2000
New Orleans, LA  70130
kevin.lavie@phelps.com

Reuben V. Anderson, Esq.
James W. Shelson, Esq.
Phelps Dunbar LLP
4270 I-55 North, POB 16114
Jackson, MS  39236-6114
Reuben.anderson@phelps.com
Jim.shelson@phelps.com