# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT



United States Court of Appeals
Fifth Circuit
**FILED**
September 21, 2018
Lyle W. Cayce
Clerk

No. 17-60698

UNITED STATES OF AMERICA,

    Plaintiff-Counter Defendant – Appellee,

v.

NATURE'S WAY MARINE, L.L.C.,

    Defendant – Appellant,

ENVIRONMENTAL POLLUTION GROUP, L.L.C.,

    Counter Claimant – Appellant.

Appeal from the United States District Court
for the Southern District of Mississippi

Before KING, ELROD, and HAYNES, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

    This appeal presents us with a question of statutory interpretation. Specifically, we must determine whether the district court was correct in its summary judgment determination that Nature's Way, as the owner of a tugboat, was also "operating" an oil barge that the tugboat was moving at the time of a collision, as the term is used in the Oil Pollution Act of 1990 (OPA).[1]

---

[1] Pub. L. No. 101-380, 104 Stat. 484 (codified as amended in 33 U.S.C. §§ 2701–2762).

No. 17-60698

Because we agree that the ordinary and natural meaning of "operating" under the statute would apply to the exclusive navigational control that Nature's Way exercised over the barge at the time of the collision, we AFFIRM the judgment of the district court.[2]

## I.

The relevant facts of this appeal are not in dispute. In January 2013, a tugboat owned by Nature's Way was moving two oil-carrying barges owned by Third Coast Towing down the Mississippi River. The barges were "dumb" barges lacking the ability for self-propulsion or navigation, and as such were reliant on the propulsion and navigation provided by the tugboat. The barges collided with a bridge, resulting in one of the barges discharging over 7,000 gallons of oil into the Mississippi River. Nature's Way and its insurer (collectively "Nature's Way"), as well as Third Coast Towing and its insurer (collectively "Third Coast") were all designated by the Coast Guard as "responsible parties" under the Oil Pollution Act. Nature's Way subsequently spent over $2.99 million on the clean-up, and various governmental entities spent over an additional $792,000.

Third Coast and Nature's Way settled a lawsuit between them in late 2014. In May 2015, Nature's Way submitted a claim to the National Pollution Funds Center (NPFC) seeking reimbursement of over $2.13 million on the grounds that its liability should be limited by the tonnage of the tugboat and not the tonnage of the barges.[3] Nature's Way also requested that it be relieved

---

[2] The parties also dispute on appeal whether Nature's Way waived any right to reimbursement from the oil spill trust fund by entering into a settlement deal with Third Coast Towing (the owner of the oil barge). However, because we affirm the judgment in the government's favor on the "operating" issue, we—like the district court—do not address that contention.

[3] The OPA limits the potential liability of a "responsible party" based on the tonnage of the vessels it was operating. *See* 33 U.S.C. § 2704(a). The NPFC manages a claims process

2

No. 17-60698

of any obligation to reimburse the government for the additional $792,000-plus. Those claims were denied by the NPFC based upon its determination that Nature's Way was an "operator" of the oil-discharging barge at the time of the collision. In January 2016, the United States initiated this litigation, seeking recovery of the additional $792,000-plus from Nature's Way and Third Coast. Nature's Way answered that it was not liable for the additional $792,000-plus, and counterclaimed that the NPFC violated the Administrative Procedure Act (APA) by deeming it to be an "operator" of the barge and consequently ineligible for reimbursement of the $2.13 million-plus.

The government moved for partial summary judgment on the sole question of whether the NPFC violated the APA by declaring Nature's Way an "operator" of the barge and denying reimbursement of the $2.13 million-plus.[4] The district court granted the government's motion for partial summary judgment, concluding that a "common sense" understanding of the term "operator," as it is used in the statute, would include a tugboat that was moving a barge through the water. Nature's Way timely appeals.[5]

---

by which eligible responsible parties who are initially over-charged can subsequently request reimbursement from the federal government. *See id.* § 2708(a)(2); 26 U.S.C. § 9509.

[4] In this appeal we do not address any other claims raised by any parties in the district court litigation.

[5] This court has interlocutory jurisdiction over the district court's grant of partial summary judgment pursuant to 28 U.S.C. § 1292(a)(3) because that order determined the rights and liabilities of the parties to an admiralty case. *See also MS Tabea Schiffahrtsgesellschaft MBH & Co. KG v. Board of Comm'rs of the Port of New Orleans*, 636 F.3d 161, 165 (5th Cir. 2011) ("[a]n order that dismisses on the merits only one of several separate claims for relief [in an admiralty case] is appealable under Section 1293(a)(3)") (citation omitted); *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 672 (1982) ("[i]f the wrong occurred on navigable waters, the action is within admiralty jurisdiction") (citation omitted).

No. 17-60698

II.

A federal court will overturn an agency's ruling under the APA "only if it is arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the record[.]" *Buffalo Marine Servs. Inc. v. United States*, 663 F.3d 750, 753 (5th Cir. 2011) (citation omitted). Federal courts generally review an agency's legal conclusions *de novo*, unless precedent obligates that we follow one of several deference regimes. *Id.* at 753–54. Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Finally, this court reviews a district court's grant of summary judgment *de novo*. *Buffalo Marine*, 663 F.3d at 753.

Both parties dedicate considerable portions of their briefs disputing whether the NPFC's determination that Nature's Way was an "operator" should be entitled to *Chevron* deference.[6] Because we conclude that even under a *de novo* review Nature's Way was "operating" the barge in the ordinary and natural sense of the word as it is used in the statute, we do not make any determination as to whether *Chevron* deference would be proper in this case. However, in the appropriate case, a thorough examination of the procedural defects alleged against the NPFC in adjudicating claims such as the one here might be warranted.[7]

---

[6] *See generally Chevron U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837 (1984); *United States v. Mead Corp.*, 533 U.S. 218 (2001) (holding that in certain cases an administrative agency's reasonable interpretation of an otherwise ambiguous statute should be given deference by the courts).

[7] "*Chevron* deference is not warranted where the regulation is 'procedurally defective'—that is, where the agency errs by failing to follow the correct procedures in issuing the regulation." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (citing *Mead Corp.*, 533 U.S. at 227 (2001)).

4

No. 17-60698

III.

Because this is a question of statutory interpretation, we begin with the text of the statute. *See Matter of Glenn*, 900 F.3d 187, 190 (5th Cir. 2018) ("We begin with the text of [the relevant statute]."). 33 U.S.C § 2702(a) establishes that each "responsible party" shall be liable for the removal costs and damages when oil is discharged into navigable waters or onto adjoining shorelines. Section 2701(32)(A) defines a "responsible party" as "[i]n the case of a vessel, any person owning, operating, or demise chartering the vessel." The statute does not define "operating," offering instead only the circular definition that an "owner or operator" is "in the case of a vessel, any person owning, operating, or chartering by demise, the vessel." *Id.* § 2701(26)(A)(i). It therefore falls to the

---

As alleged in this case, the NPFC considered the findings of a Marine Casualty Investigation Report in adjudicating the claim made by Nature's Way and determining Nature's Way to be an "operator" of the barges. However, 46 U.S.C. § 6308(a) clearly states that no part of a Marine Casualty Investigation Report, including its findings of facts, shall be admissible as evidence in "any civil or administrative proceedings."

The U.S. Coast Guard, which is both the parent agency of the NPFC and the entity that conducts Marine Casualty Investigations, has interpreted 46 U.S.C. § 6308(a) as inapplicable to the NPFC claims at issue here on the bases that such claims are an "internal, informal agency process" and that its prior interpretation of the statute—which it had read to exclude using Marine Casualty Investigation Reports as evidence in NPFC claims—was resulting in delays and duplicative efforts. *See* 71 Fed. Reg. 60,553 (Oct. 13, 2006); 72 Fed. Reg. 17,574-02 (Apr. 9, 2007).

The Coast Guard's interpretation of 46 U.S.C. § 6308(a) as inapplicable to the administrative proceeding of an NPFC claim is puzzling to say the least. The most natural reading of a statute that states no part of a Marine Casualty Investigation Report shall be admissible as evidence in "any civil or administrative proceedings" would be that such reports cannot be used as evidence in *any* civil or administrative proceedings—not that such reports cannot be used in any civil or administrative proceedings *except* for NPFC claims.

In an appropriate case, further examination is warranted on the question of whether the plain language of 46 U.S.C. § 6308(a) permits the Coast Guard's interpretation that the statute is inapplicable to NPFC claims, and, if that is not a permissible interpretation, whether the consideration of such reports in an NPFC claim would be a procedural defect precluding *Chevron* deference. However, this case is not the appropriate one to reach that issue because, without any deference whatsoever, we conclude that the NPFC's interpretation of the word "operating" is correct under the ordinary and natural meaning of the term.

5

No. 17-60698

court to give the term its "ordinary or natural meaning." *United States v. Bestfoods*, 524 U.S. 51, 66 (1998) (citation omitted).

Defining the term "operating" in the context of an oil discharge is not *terra nova* for the courts. Indeed, the Supreme Court has already grappled with the term as it is used in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA),[8] which defines the term "operator" with the exact same language as is used in the OPA. *See* 42 U.S.C. § 9601(20)(A)(i). Given that the OPA and CERCLA have common purposes and a shared history, parallel language between the two statutes is significant. *See Buffalo Marine*, 663 F.3d at 756; *see also Gen. Elec. Co. v. United States Dep't of Commerce*, 128 F.3d 767, 769–70 (D.C. Cir. 1997) (noting that prior to passage of the OPA, damages resulting from oil spills were assessed pursuant to CERCLA). A unanimous Supreme Court has analyzed CERCLA's definition of "operator" as such:

> In a mechanical sense, to "operate" ordinarily means "[t]o control the functioning of; run: operate a sewing machine." American Heritage Dictionary 1268 (3d ed. 1992); *see also* Webster's New International Dictionary 1707 (2d ed. 1958) ("to work; as, to operate a machine"). And in the organizational sense more obviously intended by CERCLA, the word ordinarily means "[t]o conduct the affairs of; manage: operate a business." American Heritage Dictionary, *supra*, at 1268; *see also* Webster's New International Dictionary, *supra*, at 1707 ("to manage"). So, under CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility.[9]

*Bestfoods*, 524 U.S. at 66.

---

[8] Pub. L. No. 96-510, 94 Stat. 2767 (codified as amended in 42 U.S.C. §§ 9601–9675).

[9] Technically, the Court in *Bestfoods* was referring specifically to the definition of an operator of a "facility" under 42 U.S.C. § 9601(20)(A)(ii), rather than an operator of a "vessel" under 42 U.S.C. § 9601(20)(A)(i); however, the analysis would apply with equal force were the word "vessel" to be substituted in for the word "facility."

It follows from that analysis that the ordinary and natural meaning of an "operator" of a vessel under the OPA would include someone who directs, manages, or conducts the affairs of the vessel. Furthermore, it follows that the ordinary and natural meaning of "operating" a vessel under the OPA would thereby include the act of piloting or moving the vessel. It is undisputed that Nature's Way had exclusive navigational control over the barge at the time of the collision, and, as such, that it was a party whose direction (or lack thereof) caused the barge to collide with the bridge. Consequently, we—like the NPFC and district court—hold that Nature's Way was "operating" the barge at the time of the collision based on the ordinary and natural meaning of the term.

Nonetheless, Nature's Way argues that the *Bestfoods* definition of "operator" should be understood differently. Nature's Way emphasizes language in another section of the *Bestfoods* opinion which states: "when [Congress] used the verb 'to operate,' we recognize that the statute obviously meant something more than mere mechanical activation of pumps and valves, and must be read to contemplate 'operation' as including the exercise of direction over the facility's activities." *Id.* at 71. According to Nature's Way, its conduct in moving the barge was more akin to the "mere mechanical activation of pumps," and it cannot be deemed to have been "operating" the barge because it was merely moving the barge as per Third Coast's directions, and it did not exercise control over its environmental affairs or inspections. In support of its argument, Nature's Way points to an order from the District of Kansas, where that court held that a vice-president with only general management responsibilities over a facility was not an "operator" of the facility under CERCLA because there was no showing that he actively managed or directed any of the facility's environmental operations. *See Harris v. Oil Reclaiming Co.*, 94 F. Supp. 2d 1210, 1213 (D. Kan. 2000).

No. 17-60698

However, navigating a barge through a river entails a degree of discretion and judgment significantly different than that required for the "mere mechanical activation of pumps." Moreover, even if the District of Kansas case were applicable to the case at hand, it would appear to cut the other way. In that case, the vice-president was held not to be an "operator" of a facility because there was no showing that he personally engaged in the activities which caused the pollution; in this case, Nature's Way directed precisely the activity that caused the pollution—it literally was the party that crashed the barge into the bridge. To hold that Nature's Way was not "operating" the barge at the time of the collision would be to strain beyond the ordinary and natural meaning of the word.

\* \* \* \*

We therefore AFFIRM the district court's grant of partial summary judgment for the government.